UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JODY CARR,<br><br>                    Petitioner,<br><br>         v.<br><br>WARDEN CARLIN,<br><br>                    Respondent. | Case No. 3:10-cv-00237-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

By Order of March 1, 2012, the Court dismissed several of Plaintiff's claims on procedural grounds, leaving the following claims for adjudication on the merits: Claims 2(b), 3(b), 4(b), 4(c), 5(a) (due process theory only), 6, 7, 10, 13 (due process theory only), 15(b) (due process theory only), 19 (due process theory only), 24(c), 24(f), and 28(a). (Dkt. 42.)

The Petition for Writ of Habeas Corpus is now fully briefed. (Dkt. 3, 56, 73.) Respondent seeks dismissal of all of Petitioner's claims. (Dkt. 56.) Also pending before the Court are various motions filed by the parties, including a Motion for Summary Judgment filed by Petitioner. (Dkt. 46.)

**MEMORANDUM DECISION AND ORDER  - 1**

Having reviewed the arguments of the parties, the record in this matter, and the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court shall decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

## INTRODUCTION

On or about February 4, 2004, Petitioner Jody Carr was arrested on charges of kidnaping and aggravated battery, in conjunction with the death of S.B., in a criminal case initiated in the Fifth Judicial District Court in Twin Falls, Idaho. Petitioner eventually pleaded guilty to first degree murder. He admits that he told two stories about how S.B. died–one true, and one false. The story that Petitioner told first, and most often, but has now disavowed, is as follows:

> Carr met S.B. at a bar and the two drove to a secluded location to engage in intercourse. When S.B. exited to the front of the vehicle, Carr ran over her twice. Carr believed S.B. was dead, and left the scene. Carr returned the next morning to make sure he did not leave any evidence and ran over S.B.'s body a third time to make sure she was not still alive. Carr fled to California with his family and was later arrested and returned to Idaho.

(State's Lodging D-4, p. 1.)

In the course of the nine years following S.B.'s death, Petitioner has added many intricately-detailed subplots to his other story of innocence, which he first told detectives of February 16, 2004. Today, he would have the courts believe that nearly all of the

**MEMORANDUM DECISION AND ORDER  - 2**

government officials who have had a hand in his investigation, incarceration, prosecution, and court actions are engaged in a conspiracy against him, a conspiracy that centers on his best friend, Caleb Casey, who allegedly raped and killed S.B., after Petitioner and S.B. sought methamphetamine from him. Petitioner now alleges there are "[p]robably more than a hundred felonies and federal crimes by the State Actors in this case." (Dkt. 73, p. 4.) Many of Petitioner's assertions of widespread foul play are contradictory and implausible.

The Court concludes that Petitioner is not entitled to have his procedurally defaulted claims heard, that he is not entitled to expand the record on the merits of his claims, and that he is not entitled to federal habeas corpus relief.

## FACTUAL BACKGROUND AND PETITIONER'S ASSERTIONS OF ACTUAL INNOCENCE

It has been one year since the Court last reviewed Petitioner's case. (Dkt. 42.) This section reviews the factual background relevant to the motions and claims now at issue. Because Petitioner's allegations of actual innocence are the basis for his motions and most of his claims, this section also reviews and reconsiders the Court's analysis on whether Petitioner is actually innocent.

The law permits a federal court to review the merits of a procedurally defaulted claim if a petitioner can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). A miscarriage of justice means that a constitutional violation has probably resulted in the

conviction of someone who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To show a miscarriage of justice, Petitioner must make a colorable showing of factual innocence, *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *Coley v. Gonzales*, 55 F.3d 1385, 1387 (9th Cir. 1995), supporting his allegations of constitutional error with new reliable evidence that was not presented at trial, *Schlup v. Delo*, 513 U.S. 298, 324 (1995). For example, types of evidence "which may establish factual innocence include credible declarations of guilt by another, *see Sawyer v. Whitley*, 505 U.S. 333, (1992), trustworthy eyewitness accounts, *see Schlup*, 513 U.S. at 331, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996).

Where the defendant pleaded guilty and did not have the evidence in his case evaluated by a jury, the petitioner must show that, based on all of the evidence, "it is more likely than not that no reasonable juror would have found Petitioner guilty. . . ." *Van Buskirk v. Baldwin*, 265 F.3d 1080, 1084 (9th Cir. 2001), *citing Schlup v. Delo*, 513 U.S. at 327; *Jaramillo v. Stewart*, 340 F.3d 877 (9th Cir. 2003) (leaving open the question of whether AEDPA raised the *Schlup* "more likely than not" standard to a "clear and convincing evidence" standard).

On February 4, 2004, when the warrant was issued for the arrest of Petitioner for kidnaping and aggravated battery, San Bernardino County Deputy Sheriff Jerry Hughes arrested Petitioner in California. (State's Lodging A-4, pp. 2-3.) On February 5, 2004,Twin Falls Police Department Detective Curtis Gambrel arrived in California. He gave Petitioner a *Miranda* warning and interviewed him. At that time, Petitioner told

**MEMORANDUM DECISION AND ORDER  - 4**

Gambrel that, on the night in question, he was very drunk and had consensual sex with S.B. Afterward, S.B. exited the car and took off one leg of her pants and underwear to urinate. Petitioner revved up the car, but it lunged forward when his foot slipped off the clutch, whereupon he accidentally ran over S.B. Confused, he made a U-turn to try to find her, and accidentally ran over her again. At that time, he determined that she was dead, and he drove away. He returned to the scene the next morning, and, believing she might be still alive and suffering, ran over her a third time to liberate her spirit from her body. (*Id.*, pp. 3-4 & Exhibit, Report of Jon F. Burke, Ph.D.)

On February 10, 2004, Gambrel interviewed Petitioner a second time in the San Bernardino County Jail. Petitioner related essentially the same story. (State's Lodging A-4, p. 4.) Petitioner was then transported to the Twin Falls County Jail.

On February 16, 2004, Gambrel interviewed Petitioner a third time, whereupon Petitioner substantially changed his story and said that his best friend, Caleb Casey, gave Petitioner and S.B. some methamphetamine because S.B. had requested drugs; Petitioner and S.B. had consensual sex; Casey then tried to rape S.B.; a small fight broke out; and then Casey pushed S.B. out the car door and ran over her twice. Petitioner said he returned to the scene the next day to look for bottles and evidence, and saw S.B. lying face up, but did not run over her. (*Id.*, p. 5.)

Caleb Casey was interviewed by Detective Gambrel and Deputy Kelly Hassani on February 16, 2004, and Casey denied having anything to do with the death of S.B. (State's Lodging A-4.) Petitioner was re-interviewed on February 16, 2004, at which time

he said he had lied about Casey and again told substantially the same story about the accidental death of S.B. and running over her three times. (*Id*.)

Petitioner told law enforcement officers where to search for S.B.'s body. She was found after several days, covered in snow, with her pants entirely off her left leg and bunched around her right ankle. (State's Lodging A-4, pp. 5-6.) S.B.'s autopsy revealed that she had several non-fatal blunt trauma wounds consistent with being hit and run over by a car, and that all of the wounds were suffered while she was alive. (State's Lodging A-2, p. 15. ) She was believed to have survived for several hours after the wounds were inflicted, because she died of exposure rather than trauma. (State's Lodging A-4 p. 6; A-2, p. 13 (The coroner testified: "If somebody found her and had taken her to the hospital, she would have survived.").) S.B. had no illegal drugs in her system. (State's Lodging A-4, p. 5.)

The car Petitioner was driving when he fled to California was towed from California to Idaho, searched, inventoried, and held as evidence for a short time. (State's Lodgings A-1, pp.37-38; C-1, p.166.) Officers created a detailed inventory list of items found in the car, and photographed many of the items. (State's Lodging A-1, pp. 204-05.) Petitioner told his family that "exculpatory" evidence was hidden in the car. When Petitioner's family attempted to retrieve or search the car several weeks later, they found it had been crushed at an Idaho junkyard. (State's Lodging C-1, p. 143.)

Petitioner was charged with first degree murder. The court originally appointed the public defender to represent Petitioner. (State's Lodging A-1, p.21.) However, private

**MEMORANDUM DECISION AND ORDER  - 6**

counsel Greg Fuller appeared on behalf of Petitioner on March 9, 2005, four months prior to trial. (State's lodging A-4, pp.5-6, 49.)

Petitioner remained in custody at the Twin Falls County Jail for approximately 15 months where he alleges the conditions of confinement were unbearably harsh. His trial was continued several times on his request. Judge Hohnhost was the presiding judge who made nearly all of the rulings in Petitioner's case. Judge G. Richard Bevan presided over Petitioner's change of plea hearing, sitting in for Judge Hohnhost. (State's Lodging A-1, p. 84; A-3.)

On June 24, 2005, just after the parties began to take preliminary steps to select a jury, Petitioner pleaded guilty to the first degree murder charge, to try to reduce the possibility of a fixed life sentence, under a plea agreement that limited the State to arguing that the maximum sentence should be thirty years fixed, with life indeterminate. (State's Lodging A-3, p. 8-9.)

At the sentencing hearing, Dr. Jon Burke, a clinical psychologist, testified on behalf of Petitioner. Dr. Burke met with Petitioner four times and spent approximately 10 hours evaluating Petitioner. (State's Lodging A-2, p. 29.) Petitioner told Dr. Burke that he ran over the victim three times, the last time to release her spirit, based on Petitioner's religious beliefs. Dr. Burke questioned Petitioner very closely about his beliefs. (*Id.*, p. 32.) Dr. Burke noted: "what was impressive to me is that [Petitioner's] story was relatively consistent from beginning to end from the time I saw him on the 25th of May to the [last time on the 20th of June]. He seemed fairly consistent." (*Id.*, p. 64.)

**MEMORANDUM DECISION AND ORDER  - 7**

Based on his interviews, Dr. Burke opined that Petitioner's acts "were motivated by opportunity and alcohol and poor judgment." (*Id.*) Petitioner's step-father, Wayne Bayse, agreed with Dr. Burke at the sentencing hearing that it was "Jody's stupidity"– the fact that "his mind doesn't work like everybody else's mind"–not an ill motive, that caused him to kill S.B. (State's Lodging A-2.)

Judge Hohnhost sentenced Petitioner to a unified life sentence with twenty-five years fixed. (State's Lodging A-1, pp. 92-93.) The judgment of conviction was entered on October 17, 2005. (*Id.*) Petitioner's only issue on appeal was that his sentence was excessive. Petitioner's appellate brief relied on his confession of having killed S.B. and returned to her body to run over her a third time to release her spirit. (State's Lodging B-1.)

In this action, Petitioner adamantly proclaims his innocence, disclaiming all of his confessions, including those made to detectives, Dr. Burke, Judge Bevan, Judge Hohnhost, and S.B.'s family. The remainder of this section summarizes his allegations supporting his claim of innocence. While actual innocence is not a cognizable habeas corpus claim, Petitioner's claims of innocence are important, because they are tied to all of his claims in some manner.

Petitioner alleges that he and S.B. went to Caleb Casey's home because S.B. wanted methamphetamine; that Casey raped and killed S.B.; and that the next day, Petitioner went back to the scene to pick up evidence, and saw S.B.'s body lying face up.

Some of the physical evidence is contrary to Petitioner's story that Casey Caleb

**MEMORANDUM DECISION AND ORDER  - 8**

killed S.B. Photographs of the body frozen in the snow demonstrate that S.B.'s body was lying face down, not face up. (State's Lodgings A-7, A-8, A-9.) S.B.'s autopsy showed she had no methamphetamine in her system, contradicting Petitioner's story that they went to Casey's home to obtain methamphetamine for S.B. (State's Lodging A-4, p. 5.)

In 2009, four years post-judgment, Petitioner learned that Detective Gambrel was under investigation for being involved in a conspiracy of fraudulently obtaining prescription pain killers with Nurse Practitioner Jan Sund. At that time, Petitioner used that information to supplement his Caleb Casey story. Petitioner's re-vamped story alleged existence of a widespread conspiracy spanning from Twin Falls, Idaho to San Bernardino County, California, including the following: Detective Gambrel was under the influence of prescription opiates when he interviewed Petitioner. Gambrel was participating in a criminal drug-fraud and conspiracy ring, and was associated with Caleb Casey (although Detective Gambrel's scheme arose from prescription pain killers that were obtained through a pharmacy and then returned to the prescribing nurse, and Casey apparently sold methamphetamine, which appear unrelated). Gambrel framed Petitioner for the murder through his drug crime ring. Wayne Basye, Petitioner's step-father, adds to this version of events, by commenting that Caleb Casey's live-in girlfriend used the type of drugs that were involved in the Sund-Gambrel prescription drug fraud conspiracy. (Dkt. 34, Exhibit 3000-500.)

Key to Petitioner's claims of prosecutorial and police misconduct in this case is Petitioner's allegations that a box of jewelry and exculpatory items was given to police

**MEMORANDUM DECISION AND ORDER  - 9**

officers, who then lost, redistributed, or destroyed the evidence. The contents of the box, and the facts surrounding it, have constantly changed.

In an Affidavit of August 16, 2007, Petitioner's step-father, Wayne Basye, declared: "We did however *find* a box of *jewelry* which we gave to Detective Gambrel while he was in our home. *We did not know where the jewelry had come from*. (*Id*., Exhibit 100-C (emphasis added.) Two years later, in an Affidavit of August 16, 2009, Wayne Basye said, not that he "found" a box of jewelry, but that the box had been given to Petitioner's parents by Petitioner's *wife*; instead of not knowing where it came from, Basye now said that Petitioner's wife had told them that "Caleb Casey and [Petitioner] had gotten it." (*Id*., Exhibit 3000-200.) In an Affidavit of October 7, 2009, Petitioner's step-father, Wayne Bayse, had even more details about the box and the origin of its contents: this time it was "a box of jewelry and miscellaneous items *which were taken from Samuel's Jewelry in Twin Falls Idaho* during a robbery involving Jody Carr and Caleb Casey." (Dkt. 34, Exhibit 3000-500 (emphasis added).) In the same Affidavit, Bayse states that, when he asked the police department for a list of the contents, he received only a list of luxury jewelry, but that "the box that we presented to Gambrel only had a *couple of pieces of jewelry, coins, baseball cards and small knives and other small but not expensive items*." (*Id*.)

Petitioner asserts that the jewelry was handled by Casey right after the murder of S.B., and Casey left his fingerprints *and* S.B.'s blood on the jewelry. He alleges that Twin Falls Detective Bill Hanchey gave the jewelry back to Samuel's Jewelers because he

**MEMORANDUM DECISION AND ORDER  - 10**

wanted to cover up the crimes of Gambrel and other Twin Falls police officers. (Dkt. 34, Exhibit 6004, Petitioner's state petition for writ of habeas corpus, and Exhibit 3000-500, Basye Affidavit.) Petitioner alleges that the jewelry was a pay-off from Casey to Petitioner for his silence regarding the murder, and that some of the jewelry "had to have come from Caleb Casey to Gambrel as further 'pay-off' as it was not in the 'box' when Petitioner's parents gave it to Gambrel." (Dkt. 34, Exhibit 6004, p. 11.) Petitioner alleges that the items in the box belonged to Caleb Casey's business partners and associates, and could have been used at Petitioner's trial to show a pattern or habit of criminal behavior, assisting "in building a defense for Petitioner and proving the guilt of Caleb Casey to multiple crimes including the murder." (*Id*. at p. 12.)

In an amended version of the state petition for writ of habeas corpus (Dkt. 34, Exhibit 6001), Petitioner elaborates on the conspiracy story. He specifies that the box of jewelry contained "hundreds of thousands of dollars worth of assorted rare, antique, and ancient monies, rare and ancient coins, and a large hoard of jewelry," many of which were stolen from Samuel's Jewelry, the Kimberly/Eastland auction house, and the Main Street antique store. The box also contained items that had been acquired by Petitioner throughout the course of his life. Elsewhere, Petitioner describes the box as containing "jewelry and other valuables worth approximately half a million dollars." (Petition, Dkt. 3, p. 9.) This, of course, stands in contrast to his step-father's statement, that the box contained only a couple of pieces of jewelry, coins, baseball cards, small knives, and other small but non-expensive items.

**MEMORANDUM DECISION AND ORDER  - 11**

Another implausible chapter in Petitioner's story is that he alleges he had hidden in his car a videotape of Caleb Casey confessing to the murder of S.B. and threatening the lives of Petitioner and his family if Petitioner were to "snitch." (Petition, Dkt. 3, p. 19.) Petitioner told his step-father that the hidden videotape was his "ace in the hole." (Dkt. 34, Exhibit 3-000-200.) However, if Petitioner had such evidence, surely he would have pointed authorities to it immediately– to help protect his family–the first time he told the Caleb Casey story. In addition, Petitioner has never clearly outlined: (1) the details of the conversation on tape; (2) why Casey confessed; (3) when Casey confessed; (4) where Casey confessed; (5) which video camera Petitioner used; and (4) how Petitioner was able to hold a conversation with Casey and at the same time surreptitiously capture it on videotape. Petitioner alleges that the car involved in the killing was crushed to hide evidence of Casey's involvement. (However, there is no evidence in the record from the junkyard operator or any law enforcement officer regarding why the car was crushed.)

Petitioner further alleges he told Detective Gambrel the false confession story because he had been instructed to do so by the actual guilty party, and it was the only thing he could do to keep himself and his family safe. Petitioner had been arrested in San Bernardino County in California, which he alleges is the "hometown" of Caleb Casey. Petitioner "had to admit to the crime and give the false testimony due to the fact that the guilty party was a long term drug manufacturer and dealer and that many of the officers in San Bernardino were corrupt and on the guilty party's payroll." Petitioner alleges that the 26-year-old guilty party has millions of dollars and no job, but owned a $300,000 home in

**MEMORANDUM DECISION AND ORDER  - 12**

Idaho and a home in southern California, both of which were filled with millions of dollars of belongings. Petitioner alleges that Caleb Casey quickly sold his house and left town to avoid being held responsible for the murder of S.B.

Petitioner told Gambrel that the guilty party was paying one of the local law enforcement officers to keep the heat off of himself, and Gambrel told Casey that Officer Hassani (who helped interview Casey) was an ex-San Bernardino officer who moved to Twin Falls, and that Petitioner should not trust Hassani. (*Id.*, pp. 7-9.)

Yet another theory proffered by Petitioner is that, after Petitioner found out that Gambrel told Caleb Casey that Petitioner had implicated Casey as the murderer, Petitioner decided he had to take the blame for S.B.'s death to protect his wife's and children's lives, and so he returned to the story of his original confession and disavowed the Caleb Casey story. (*Id.*, p. 9.) This theory makes little sense. If Petitioner truly was concerned about protecting his family, he does not explain why he simply did not keep the Caleb Casey story secret or provide the videotape to officers immediately to ensure that Casey would be arrested and not released on bond. Instead, Petitioner attempted to lay blame on Caleb Casey as soon as Petitioner was returned to Twin Falls from California. Petitioner alleges that, once he was imprisoned, he felt "safe" to go after Casey, but this reasoning is nonsensical, given that Casey had allegedly threatened Petitioner's family, and they were now left alone with Casey in the outside world while Petitioner was safely imprisoned. The record tends to show that Petitioner periodically revealed the "secret" that Casey murdered S.B. to attempt to gain his personal freedom,

**MEMORANDUM DECISION AND ORDER  - 13**

which means that Petitioner paved the way several times for Caleb Casey to harm

Petitioner's family while he remained at large.

If the foregoing theories were not enough, Petitioner told yet another tangential

tale that is related to the overall conspiracy claim–Petitioner alleges that his conditions of

confinement were made so difficult by jailors that it forced him, an innocent man, to

plead guilty to first degree murder. The Court takes judicial notice that Petitioner was not

able to present sufficient evidence in his conditions-of-confinement claims to overcome

summary judgment in a federal civil rights action about the Twin Falls County Jail

conditions, *Carr v. Tousley*, Case No. 1:06-cv-00125-JLQ. (See Dkt. 171 in Case No.

1:06-cv-00125-JLQ.)

Petitioner makes much ado about the fact that his attorneys failed to submit in

post-conviction proceedings the many affidavits of other inmate he had gathered that

discuss the poor living conditions at the Twin Falls County Jail (Dkt. 34, Exhibit 6004).

However, he has yet to explain whether jailors were using the conditions to pressure all

inmates to plead guilty in all criminal cases, or whether any other inmate has alleged that

the conditions were so poor that he felt compelled to plead guilty so he could be

transferred to the state penitentiary, rather than profess his innocence to a felony charge.

Even if one can make sense of Petitioner's elaborate web of events and

circumstances that caused him to plead guilty though innocent, it pales in comparison to

the number of different times and different contexts in which Petitioner admitted

responsibility for S.B.'s death, including: (1) in the first pretrial confession; (2) in the

**MEMORANDUM DECISION AND ORDER  - 14**

third pretrial confession; (3) in discussions with his lawyer;[1] (4) during a psychological interview by Dr. Jon Burke; (5) in the presentence investigation report;[2] (6) during the change-of-plea colloquy, when the Court questioned Petitioner under oath about having committed the killing (A-2, pp. 143-144); and (7) during the sentencing hearing, when Petitioner again asserted under oath that he killed S.B., and he apologized to her family.

After the prosecution played for the sentencing judge the second police interview with Petitioner, where Casey was blamed for the murder (with the prosecution's purpose to show that Petitioner lied and did not want to take responsibility for the killing at that time), Petitioner voluntarily stated the following at the sentencing hearing when given an

---

[1] At the plea colloquy, Petitioner's attorney answered the court's question as to whether the in-custody statements were constitutionally valid, and Petitioner's attorney responded:

> Yes, there were several [in-custody statements]. They were videotaped and they were audiotaped and we have been though those many times and discussed them many times and I feel that everything, the totality of the circumstances, the facts brought out by those would justify his plea at this time.

(State's Lodging A-3, p. 11.)

[2] The Presentence Investigation Report states:

> Jody told me that he has always gotten himself out of trouble in the past by lying, cheating, running or even buying his way out. He said he knew from the second this crime occurred that there was no way out and he said he did not know how to deal with the incident.
> * * *
> The Defendant advised he did not expect to be charged with Murder in this incident, and he said that he tried to lie his way out when he was initially charged. The defendant said that he made up a story about his friend, Caleb, as he said he was "still tripping and not ready to deal with the loss of a life." He also said that he tried to "snitch" his way out as well so that he could be "cut some slack." he admitted that he also considered escaping from the jail at a time so that he would not be held accountable." (State's Lodging A-4, p. 18.)

MEMORANDUM DECISION AND ORDER  - 15

opportunity to speak:

| The Court: | Mr. Carr, do you wish to say anything? |
|---|---|
| Petitioner: | Yes, sir. I can't face it. I wish I could. I'm sorry isn't going to cut nothing. I had a very bad accident. I ran from that out of fear and in a cowardly fashion. I'm sorry. I can't make it better. I just – there was times that I lied to the detective because I just got off the phone with my kids and they were crying for me to come home. I can't send [S.B.] home to her kids. I tried real hard in life even though a lot of my decisions were stupid. I don't know all the panic disorder stuff and all that kind of stuff. I do know that in a blink of an eye something can happen sometimes where you can't undo it. I had no idea that she was alive and I just ran to save my own children. I didn't think anything about her or anyone else. I wish I could fix it. I can't. I'm sorry to her family. I'm sorry to my family, and that's all I really have. |

(State's Lodging A-2, pp. 143-44.) While at sentencing Petitioner told the judge and

S.B.'s family that he made up the *Caleb Casey story* in order to get out of jail and return

to his children, he now asserts that threats from Casey, his conditions of confinement, and

his feelings after talking to his children prompted him make up the *accidental death story*.

Petitioner had every opportunity to tell his lawyer and the Court that jailors

purposely were making his conditions of confinement so difficult that he would plead

guilty, and that he did not accidentally kill S.B., but rather Caleb Casey killed her. But

Petitioner reiterated again and again his responsibility for the crime. During the plea

colloquy, the following discussion occurred:

| The Court: | Is there or are you suffering from any mental or psychological problems that make it hard for you to |
|---|---|

**MEMORANDUM DECISION AND ORDER  - 16**

understand these proceedings?

Petitioner:     No, sir.

The Court:      Is there anything else going on in your life that affects
                your ability to make a reasoned and informed decision
                today?

Petitioner:     No, sir.

The Court:      Have you had enough time to discuss this matter with
                Mr. Fuller [Petitioner's counsel]?

Petitioner:     Yes, sir.

The Court:      Have you had adequate access to your lawyer to
                discuss the law and the facts of this case?

Petitioner:     Completely.

The Court:      Has your attorney explained the rights that you're
                giving up by this plea of guilty?

Petitioner:     Yes, sir.

The Court:      Has he talked about defenses that you could present to
                the charge?

Petitioner:     Yes, sir, he has.

The Court:      Is there anything you've wanted your attorney to do for
                ask him to do to help you with your case that he hasn't
                done?

Petitioner:     No, sir, not at all.

The Court:      Are you satisfied with your attorney's representation?

Petitioner:     Completely.

The Court:      Have you gone over discovery with your attorney?

**MEMORANDUM DECISION AND ORDER  - 17**

| | |
|---|---|
| Petitioner: | Yes, sir. |
| The Court: | Did you understand what was discussed? |
| Petitioner: | Yes, sir. |
| The Court: | Do you request any additional discovery be done in your case? |
| Petitioner: | No, sir, I do not. |

(State's Lodging A-3, pp. 6-7.)

Regarding the voluntariness of Petitioner's plea, the following was discussed at the

change of plea hearing:

| | |
|---|---|
| The Court: | Has anyone threatened you or anyone close to you in order to get you to enter a plea of guilty here today? |
| Petitioner: | No, sir. |
| The Court: | Is your decision to plead guilty a voluntary decision? |
| Petitioner: | Yes, sir, it is. |

(State's Lodging A-3, p. 10.)

Regarding the underlying facts supporting the guilty plea, Petitioner, who was

under oath, elaborated on the incident as follows:

| | |
|---|---|
| The Court: | Tell me why you're guilty. |
| Petitioner: | Your Honor, I had an accident and then after the accident, not being in my right state of mind, which I hope that later on the court will take into consideration, I willingly ran over the defendant, the victim. |

**MEMORANDUM DECISION AND ORDER  - 18**

The Court:    Willingly ran over her as you were operating a motor vehicle?

Petitioner:    Yes, sir.

The Court:    And this was [S.B.]?

Petitioner:    Yes, sir, it was.

The Court:    And you did willfully with premediation –

Petitioner:    Yes, sir.

The Court:    – run over her?

Petitioner:    Yes, sir.

The Court:    And this was in a remote location in the middle of the night?

Petitioner:    It was the next morning, sir, but yes, it was a remote location.

(*Id.*, pp. 13-14.)

Specifically as to cases in which convicted felons challenge their guilty pleas, the

United States Supreme Court stated:

> [T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

In this case, Petitioner took responsibility not once, but at least seven times,

**MEMORANDUM DECISION AND ORDER - 19**

including in the most solemn of circumstances under oath–the change-of-plea colloquy and at sentencing when addressing S.B.'s surviving family members. Petitioner also admitted several times that the Caleb Casey version was a lie, crafted to gain Petitioner's freedom. In addition, he stated that, generally, he had always gotten himself out of trouble in the past by lying, cheating, running or even buying his way out. (State's Lodging A-4, p. 18.)

The Court previously determined that the entire record, including Petitioner's submissions that have been admitted only in the procedural default context, contained insufficient evidence to show actual innocence to excuse the default of Petitioner's claims and that Petitioner failed to show that it is more likely than not that no reasonable juror would have found Petitioner guilty if he had proceeded to trial. Another long, hard look at the record at this stage of proceedings leads the Court to the same conclusion.

The Court now proceeds to consider Petitioner's motion to reconsider the procedural default of four of his claims, the motion to expand the record, and the merits of the remaining claims.

## REVIEW OF PENDING NON-DISPOSITIVE MOTIONS

In the Order of March 1, 2012, the following claims were determined to be procedurally defaulted: Claims 1, 2(a), 2(c), 3(a), 4(a), 5(b), 8, 9, 11, 12, 13(b), 13(c), 13(d), 14, 15(a), 15(c), 16, 17, 18, 20, 21, 22, 23, 24(a), 24(b), 24(d), 24(e), 25, 26, 27, 28(b), 28(c), 29, and 30. (Dkt. 42.) The Court also determined that Petitioner had failed to show that either the cause and prejudice or the miscarriage of justice exceptions should be

**MEMORANDUM DECISION AND ORDER  - 20**

applied to excuse the default of his claims. (Dkt. 42, pp. 27-29.)

1.    **Petitioner's "Motion to Show Cause and Plea to Excuse State Remedy, Exhaustion Requirement" (Dkt. 45)**

    A.    *Standard of Law*

The Court has not yet issued a final order in this case. "As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (internal citation omitted). On reconsideration, the courts may correct "simple mistakes," as well as alter "decisions based on shifting precedent, rather than waiting for the time-consuming, costly process of appeal." *U.S. v. Martin*, 226 F.3d 1042, 1049 (9th Cir. 2000). However, while a court "has the power to revisit prior decisions of its own . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (citation omitted).

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

A petitioner does not have a federal constitutional right to effective assistance of

counsel during state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551

(1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). As a result, the general rule

is that any errors of his counsel during the post-conviction action cannot serve as a basis

for cause to excuse Petitioner's procedural default of his claims. *See Coleman v.*

*Thompson*, 501 U.S. 722, 752 (1991).

The holding of *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), established a "limited

qualification" to the *Coleman* rule. *Id*. at 1319. In *Martinez*, the court held that inadequate

assistance of counsel "at initial-review collateral review proceedings may establish cause

for a prisoner's procedural default of a claim of *ineffective assistance at trial*." *Id*. at 1315

(emphasis added). The *Martinez* Court explained that the limited exception was created

"as an equitable matter, that the initial-review collateral proceeding, if undertaken without

counsel or with ineffective counsel, may not have been sufficient to ensure that proper

consideration was given to a substantial claim." *Id*. at 1318.

To show "prejudice" to excuse the procedural default of a claim, a petitioner bears

"the burden of showing not merely that the errors [in his proceeding] constituted a

possibility of prejudice, but that they worked to his actual and substantial disadvantage,

infecting his entire [proceeding] with errors of constitutional dimension." *United States v.*

*Frady*, 456 U.S. 152, 170 (1982).

**B.**     ***Petitioner's Claims at Issue***

Petitioner's 80-page "Motion to Show Cause and Plea to Excuse State Remedy,

Exhaustion Requirement" (Dkt. 45) requests reconsideration of the decision on

**MEMORANDUM DECISION AND ORDER  - 22**

procedural default as to Claims 2(a), 2(c), 4(a) and 21. (Dkt. 42.) The content of the four

claims are as follows: Claim 2(a)&(c) are that detectives were involved in

drug/conspiracy ring and detectives and prosecutor concealed exculpatory evidence;

Claim 4(a) is that the detective and sheriff's deputy violated Petitioner's right to an initial

appearance; and Claim 21 is that Judge Bevan, who presided at the change-of-plea

hearing, was also Petitioner's attorney. Important to the procedural default analysis is that

none of these claims is an *ineffective assistance of trial counsel* claim, and, thus, *Martinez*

is inapplicable.

### C.      *Petitioner's Post-Conviction Counsel, his Request to Proceed Pro Se, and Lack of a Showing of Prejudice*

Petitioner alleges that various defects in the post-conviction proceedings beyond

his control caused the default of his four claims. Petitioner filed his application for post-

conviction relief pro se on March 17, 2006, and he filed a motion for appointment of

counsel. (State's Lodging C-1, pp. 121-124.) The Court appointed Counsel Marilyn Paul

of the Public Defenders' Office. (*Id.*, p. 127.) Because of a conflict, Thomas Kershaw was

next appointed to represent Petitioner in the same matter. Mr. Kershaw filed several

pleadings and papers on Petitioner's behalf, including a response to the Court's notice of

intent to dismiss and several affidavits to support the application. (*Id.*)

Judge Hohnhost, the presiding district judge, passed away in February 2007.

(State's Lodging C-1, p. 184.) In an unrelated court appointment to the bench, Mr.

Kershaw became a magistrate judge in August 2007. As a result, Attorney Tim Williams

**MEMORANDUM DECISION AND ORDER - 23**

was asked to find new counsel for Petitioner to replace Mr. Kershaw. (*Id.*)

Petitioner also asked for new counsel to be appointed on September 25, 2007. (State's Lodging C-1, p. 170.) A letter from Attorney Tim Williams to Judge Stoker stated that he had asked many attorneys to take Petitioner's case, but all had declined. (*Id.*, p. 171.) Anthony Valdez was eventually appointed to represent Petitioner, and Mr. Valdez was given additional time to respond to the notice of intent to dismiss. (*Id.*, p. 185.) At a status conference, Mr. Valdez indicated to the Court that he did not wish to submit anything further. (*Id.*)

On December 10, 2007, Petitioner asked the court to hold an evidentiary hearing. (*Id.*, p. 175.) He also asked the court for permission to proceed pro se. (*Id.*, p. 176.)

Judge Randy J. Stoker, successor to Judge Hohnhorst, dismissed the post-conviction application on April 10, 2008. (*Id.*, pp. 181-193.) In that order, he denied Petitioner's motion for an evidentiary hearing and motion to proceed pro se. (*Id.*)

Petitioner asserts that it was his "Right as an American Citizen" to proceed pro se in his post-conviction action. (Dkt. 45, p. 2.) While the right to self-representation is not absolute, the Court considers the course of Petitioner's counsel's handling of the post-conviction case and Petitioner's requests to proceed pro se.  Petitioner alleges that when he attempted to file over 700 pages of evidentiary exhibits with the state district court, Mr. Kershaw "intercepted and stole" the exhibits. Petitioner alleges that the exhibits were never presented to the state court in an amended petition, but that Mr. Kershaw filed only two affidavits. (*Id.*) Petitioner alleges that he was forced to proceed pro se because the

**MEMORANDUM DECISION AND ORDER  - 24**

exhibits were not filed or returned to Petitioner by Mr. Kershaw, who withdrew from his case because Mr. Kershaw did contract work for the Twin Falls Sheriff's Department (rather than because Mr. Kershaw was appointed a magistrate judge). (Dkt. 34, Exhibits 5000-F and -E.)

Petitioner also alleges that Mr. Valdez refused to file the exhibits, saying that they would later be presented at an evidentiary hearing, and Mr. Valdez stole exhibits from Petitioner. (Dkt. 34, Exhibit 2000-M.) The exhibits were never presented to the court, and, as noted above, the entire post-conviction case was dismissed.

Petitioner asserts that eventually he received all of his exhibits back. Petitioner has not shown how the missing exhibits led to the procedural default of his four claims, which were deemed defaulted here because the claims were not included in the petition for review, not for another reason, including lack of exhibits. (See Order at Dkt. 42.) In any event, Petitioner's argument boils down to a claim that Attorneys Kershaw and Valdez, both post-conviction counsel, were ineffective because they failed to submit all of the exhibits Petitioner wished to submit. However, under *Coleman* and *Martinez*, ineffective assistance of post-conviction counsel *cannot* be used as cause for the procedural default of any claims except ineffective assistance of trial counsel claims. Petitioner is not asking for reconsideration of any such claims. Accordingly, the actions of these attorneys in failing to use additional exhibits in support of Petitioner's post-conviction application or failing to return exhibits to Petitioner cannot excuse the procedural default of the four claims at issue.

**MEMORANDUM DECISION AND ORDER - 25**

Petitioner further argues that the state district court caused the default of Petitioner's claims because Petitioner was not permitted to proceed pro se in the post-conviction case. (Dkt. 45-1, p. 4.) Had Petitioner been able to proceed pro se, he argues, he would have filed his exhibits, and his four claims would not have been procedurally defaulted.

First, Petitioner has failed to show any causal link between the missing exhibits and the failure to bring the four claims at issue in his state court petition for review. Second, as the Court discusses below, Petitioner has failed to show that prejudice resulted from the failure to bring these claims, because, even with Petitioner's added exhibits, his claims are meritless.

**D.      *Petitioner's Allegation that State Courts and their Agents Precluded Him from Properly Exhausting his Claims***

Petitioner argues that he should be excused from exhausting his state court remedies because he "has done everything in his power to bring 100% of all claims and exhibits to the state courts, but has been blocked and hindered and thwarted due to [] actions by the courts and their agents." (Dkt. 45, p. 1.)

Petitioner alleges that Attorney Robin Fyffe, who was appointed to represent him next in the post-conviction appellate proceedings, told him to file a successive post-conviction petition and allege that his post-conviction counsel had been ineffective during the first post-conviction action. She told him that the successive petition should be filed as soon as the first post-conviction appeal was completed.

**MEMORANDUM DECISION AND ORDER  - 26**

Petitioner alleges that, on October 4, 2009, or January 6, 2010, he submitted for filing with the Fifth Judicial District Court a successive application for post-conviction relief (Dkt. 34, Exhibit 6004) and another state habeas corpus petition. (Dkt. 34, Exhibit 6005.) Both of these filings contained all of the exhibits Petitioner wished to submit. Petitioner alleges that the state court never responded, but instead acted as though it had never received the filings (no correspondence to or from the state court about the filing or status of this action is provided). (*Id.*) Petitioner alleges that a conspiracy among court staff and other government employees and officials has caused the filings to disappear.

Petitioner has provided no evidence that he actually mailed (or submitting for filing) the successive post-conviction petition. Petitioner produced a large set of receipts for requests for indigent copies, envelopes, and stamps, but the only receipts he submitted from 2009 and 2010 were from June and July 2009, for "postage,"; April 21, 2010, for a 44-cent stamp; and on May 5, 2010, for one set of copies consisting of 139 pages, and one large envelope. (Dkt. 70, IDOC kites.) These are all dates that do not correspond with the alleged mailing of the successive petition–October 4, 2009, or January 6, 2010.

During the pendency of his first post-conviction appeal, Petitioner filed his first federal habeas corpus petition, on October 17, 2008, in Case No. 1:08-cv-00440-BLW, *Carr v. Henry*. In that action, Judge Winmill informed Petitioner that he needed to exhaust his state court remedies, and, if they had not been exhausted, the case should be stayed or dismissed. Judgment was entered dismissing the case on June 1, 2009.

The state appellate court opinion affirming dismissal of the post-conviction action

**MEMORANDUM DECISION AND ORDER  - 27**

was filed on October 28, 2009. (State's Lodging D-4.) Petitioner then filed a "Motion Requesting Order to File a Criminal Complaint" in the closed federal habeas corpus case.

On March 15, 2010, Judge Winmill denied the motion and informed Petitioner: "*To the extent* that Petitioner has now properly exhausted his state court remedies and intends to file a new Petition for Writ of Habeas Corpus challenging his state court conviction under 28 U.S.C. § 2254, he shall submit a Petition. . . . If Petitioner is seeking monetary damages for the conditions of his confinement or other civil rights violations, the appropriate avenue of relief is in an action brought under 42 U.S.C. § 1983." (Dkt. 32 in Case No. 1:08-cv-00440-BLW, *Carr v. Henry* (emphasis added).)

In this action, Petitioner states that, "*instead of*" receiving a response from the Fifth District Court about his successive post-conviction petition, he received the Order from Judge Winmill. It is very unclear why Petitioner believes that the Order from the federal court arrived "*instead of*" a state court order, when the two courts and the two actions are completely independent of one another. Because the statement is nonsensical, it suggests that perhaps the underlying facts are not true–that Petitioner did *not* file the successive post-conviction action in state court.

Another of Petitioner's statements that suggests that he did not file the successive post-conviction application is his allegation that the United States Courts "ordered" Petitioner "to take action *out of turn*," reflecting that Petitioner likely filed the federal action instead of the successive post-conviction action. (Dkt. 45-1, pp. 15-16 (emphasis added).)

**MEMORANDUM DECISION AND ORDER  - 28**

It appears that, instead of filing his successive post-conviction petition that he had prepared, Petitioner filed a new federal habeas corpus petition (this action), on May 10, 2010. Petitioner did *not* mention in his new petition that he had filed a state successive post-conviction action, nor did Petitioner contest Respondent's "Lodging of the State Court Record," by stating that he had filed a successive petition that was not included in the record. Rather, in his new petition, Petitioner asserted that he had "new claims" to bring (which would not be "new" had he filed a successive post-conviction action). The failure to mention the pending successive post-conviction action early in the new federal habeas corpus action is in direct contravention of the instructions and statements of the law on pending state court actions and mandatory exhaustion requirements Petitioner received from Judge Winmill in the first federal habeas corpus action.

Based on all of the foregoing, the Court concludes that Petitioner has not brought forward sufficient evidence to show that he filed a successive post-conviction action in state court that was ignored or destroyed by the state court, rather than adjudicated. As a result, his state court conspiracy theory does not establish cause for the default of his claims.

Petitioner also argues that it was improper for Judge Winmill to determine that his state remedies were exhausted and order him to file a pleading, and that Petitioner later had to suffer dismissal of his claims because he did not exhaust his state court remedies. However, Petitioner is mistaken in his view that the Order language meant that Judge Winmill *determined* that Petitioner's state law remedies were exhausted; to the contrary,

**MEMORANDUM DECISION AND ORDER  - 29**

the language "to the extent" is the equivalent of "if." A determination of whether claims are properly exhausted does not occur until *after* a petitioner files a petition containing all such facts pertinent to that decision, and, often, a response or motion from the respondent and a copy of the state court record is required. The Order from Judge Winmill does not provide cause for the default of Petitioner's four claims.

### E.    *No Prejudice*

After reviewing the record, including the exhibits that were not presented to the state district court because his attorneys failed to do so, the Court concludes that Petitioner has not shown that prejudice would result if the Court did not hear the procedurally defaulted claims, because his claims lack merit. In particular, Petitioner relies on speculation rather than sufficient evidence for Claims 2(a)&(c), as discussed above; Claim 4(a) was waived by his guilty plea;[3] and Claim 21 is frivolous.[4]

## 2.    Petitioner's Motion for Evidentiary Hearing (Dkt. 48)

Petitioner asserts that, because he never received an evidentiary hearing in state

---

[3] "A valid guilty plea waives all nonjurisdictional defects and defenses, whether constitutional or statutory, in prior proceedings. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973).

[4] Petitioner provides a copy of a letter from Hollifield and Bevan, P.A., dated April 8, 2002, in which Richard Bevan, then in private practice, provided contract services to inmates under the Inmate Legal Assistance Program. The jail was to pay him $100 or $110 an hour. Richard Bevan was appointed to be a District Judge in the Fifth Judicial Distrct in November 2003. Thus, by the time Petitioner was arrested in 2004, Richard Bevan was a judge, and no longer a contract attorney, his judgeship having usurped any unfinished portion of the contract to represent inmates. (See Dkt. 34, Exhibit 6004, internal exhibit no. GA. G.) Neither does Petitioner ever claim that he had an actual attorney-client contact of any kind with Bevan. This claim is without a legal or factual basis.

**MEMORANDUM DECISION AND ORDER  - 30**

court on any of his claims, he is entitled to an evidentiary hearing in federal court. The Court previously addressed and denied Petitioner's request for the Court to review evidence that was not presented to the Idaho state courts, except in the context of procedural default. The procedural analysis is now complete, and Petitioner may not use the extra-record evidence on review of the merits of his claims. (Where the Court mentions these exhibits in its merits analysis, below, it is simply to show that the exhibits would not have made a difference in the outcome of the claim.)

No grounds exist for an evidentiary hearing. The United States Supreme Court has recently clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). All of the remaining claims were adjudicated on the merits.

Petitioner could qualify for an evidentiary hearing if he could show that the factual determination of the state courts was unreasonable under § 2254(d)(2). In that case, then the Court would not be limited by § 2254(d)(1), but would proceed to a de novo review of the claims, which may include consideration of evidence outside the state court record. *See Maxwell v. Roe*, 628 F.3d 486, 494-95 (9th Cir. 2010). *See also Jones v. Walker*, 540 F.3d 1277 (11th Cir. 2008) (*en banc*).

If a petitioner is unable to show that the factual determination of the state court was unreasonable, then the Court examines the legal basis of the state court decision under the limitations of § 2254(d)(1) and is confined to the evidence contained in the state court record. *See Cullen v. Pinholster*, 131 S.Ct. at 1400.

**MEMORANDUM DECISION AND ORDER - 31**

Here, as more fully explained below in the context of the claims at issue, Petitioner has not shown that the factual finding of the state courts was unreasonable on the merits of the remaining claims. As a result, no new evidence will be admitted and no evidentiary hearing will be held.

**3.      Petitioner's Motion for Reconsideration of Appointment of Counsel (Dkt. 47)**

Petitioner argues that appointment of counsel is required, because an evidentiary hearing in this case should be held. Because the Court has determined that an evidentiary hearing is not warranted and Petitioner's claims are plainly without merit, appointment of counsel is not required. In addition, the Court has considered whether any other reason exists to appoint counsel, and has determined that appointment of counsel would not aid the Court in its decisionmaking in this case.

**4.      Petitioner's Motion to Expand the Record (Dkt. 49)**

Petitioner asks the Court to allow him to expand the record because of widespread "thefts, withholdings, and destructions of pleadings, documents and exhibits." (Dkt. 49, p. 2.) He wishes to expand the record to include letters, documents, exhibits, answers, and affidavits. (*Id.*)

As set forth above, Petitioner's allegations of stolen and destroyed documents that might be relevant to this case are not supported by sufficient evidence in the record, but are based on speculation and hearsay. In the case of the successive post-conviction, the allegations appear fabricated. *Pinholster* prohibits a federal habeas corpus court from entertaining new evidence where the claims at issue were adjudicated on the merits by the

**MEMORANDUM DECISION AND ORDER  - 32**

state court. Because that is the case, here, Petitioner's motion will be denied.

5.      **Respondent's Motions for Extension of Time to File Answer or Motion for Summary Judgment (Dkt. 55, 62) and Petitioner's Motion Objecting to Respondent's Second Motion for Extension of Time (Dkt. 63)**

Respondent seeks two extensions of time to file the answer or motion for summary judgment due to an extensive work load. Petitioner opposes the second extension of time, citing to the fact that Respondent already was granted a prior extension of time; however, it is clear that Respondent's counsel has an extremely heavy workload occasioned by the number of prisoner filings, and it is also clear that the extensive number of documents filed in this case take an enormous amount of time to review. Good cause appearing, the Motion will be granted, the Motion Objecting to the same will be denied, and the Answer will be considered timely.

6.      **Respondent's Motion to Strike Petitioner's Exhibits (Dkt. 61)**

Respondent requests that the Court strike the documents Petitioner has submitted with his brief regarding summary judgment, at Dockets 46-2 through 46-10, because the records were not previously submitted to the state court in any proceeding relevant to this habeas corpus case and because the documents would serve no purpose at this stage of the proceedings. Good cause appearing based on *Pinholster*, the Motion will be granted.

## CONSIDERATION OF MERITS OF REMAINING CLAIMS

Petitioner has filed a Motion for Summary Judgment on the remaining claims. (Dkt. 46.) Respondent has filed an Answer and Brief in Support of Dismissal of All Claims (Dkt. 56.) Based on the record in this matter, the Court will deny Petitioner's

MEMORANDUM DECISION AND ORDER  - 33

Motion for Summary Judgment and dismiss the Petition for Writ of Habeas Corpus with prejudice, for the following reasons.

**1.      Standard of Law**

Summary judgment is appropriately granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(1)(a). The Federal Rules of Civil Procedure apply to habeas corpus actions except where application of the rules would be inconsistent with established habeas practice and procedure. Rule 11, Rules Governing Section 2254 Cases. Accordingly, summary judgment motions are appropriate in habeas corpus proceedings where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977). Judicial notice will be taken of the court docket in the underlying state court proceedings. Fed. R. Evid. 201(b); *Dawson v Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

Petitioner's Motion for Summary Judgment does not take into consideration that a petitioner must work within the context of the Anti-terrorism and Effective Death Penalty Act (AEDPA) to show entitlement to summary judgment. Petitioner points to areas of "undisputed fact"; however, Respondent is not required to "dispute" Petitioner's facts except as is appropriate within habeas corpus law, because the state court's factual findings are presumed correct.

Federal habeas corpus relief is available when the federal court determines that the petitioner "is in custody [under a state court judgment] in violation of the Constitution or

**MEMORANDUM DECISION AND ORDER  - 34**

laws or treaties of the United States." 28 U.S.C. § 2254(a). Under § 2254(d), as amended

by the Anti-terrorism and Effective Death Penalty Act (AEDPA), federal habeas corpus

relief is further limited to instances where the state-court adjudication of the merits:[5]

1.     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

When a party contests the state court's legal conclusions, including

application of the law to the facts, § 2254(d)(1) governs. That section consists of

two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, for a decision to be "contrary to" clearly established federal

law, the petitioner must show that the state court applied "a rule of law different

from the governing law set forth in United States Supreme Court precedent, or that

the state court confronted a set of facts that are materially indistinguishable from a

decision of the Supreme Court and nevertheless arrived at a result different from

the Court's precedent." *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).

Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1), the petitioner must show that the state court was "unreasonable in

applying the governing legal principle to the facts of the case." *Williams*, 529 U.S.

---

[5]A state court need not "give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

**MEMORANDUM DECISION AND ORDER - 35**

at 413. A federal court cannot grant relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). The state court need not cite or even be aware of the controlling United States Supreme Court decision to be entitled to AEDPA deference. *Early v. Packer*, 537 U.S. 3, 8 (2002).

Though the source of clearly established federal law must come from the holdings of the United States Supreme Court, circuit law may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

A federal habeas court can look only to the record before the state court in reviewing a state court decision under section 2254(d)(1). *Cullen v. Pinholster*, 131 S.Ct. at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.") (footnote omitted); *Holland v. Jackson*, 542 U.S. 649, 652 (2004) ("[W]e have made clear that whether a state courts decision was unreasonable must be assessed in light of the record the court had before it.") (citations omitted). On habeas review, state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this

**MEMORANDUM DECISION AND ORDER - 36**

presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**2.      Claim 2(b) and 3(b)**

Claim 2(b) is that the investigating detective concealed exculpatory evidence given to him by Wayne and Sandi Bayse after Petitioner's arrest that would have proven that Caleb Casey killed S.B. (Dkt 3, pp. 9-13.) Claim 3(b) is that Petitioner's due process rights were violated when the lead detective concealed exculpatory evidence, including an alleged tape of Caleb Casey confessing to the murder.

By affidavit in the state post-conviction case, Petitioner claimed that Caleb Casey gave Petitioner a box of stolen jewelry and other valuables to remain quiet; that Petitioner, in turn, gave it to his parents; that Petitioner's parents gave the box to the detective; but that the detective kept the box and never entered it into evidence. (D-4, p. 6.) Petitioner also alleged that his vehicle contained exculpatory evidence: methamphetamine; beer cans with fingerprints of the victim and Caleb Casey; and a taped confession of Caleb Casey. Petitioner alleges that the investigating officers destroyed this evidence, either by taking it and not documenting it on the inventory list or by ordering that his vehicle be crushed before it could be inspected by Petitioner's counsel and family members. (*Id.*, pp. 6-7.)

The Idaho Court of Appeals determined that Petitioner's due process rights were not violated. (State's Lodging D-4.) The Court of Appeals applied the

**MEMORANDUM DECISION AND ORDER  - 37**

following three-factor test from *Paradis v. State*, 716 P.2d 1306 (1986): (1) whether the evidence is material to the question of guilt or the degree of punishment; (2) whether the defendant was prejudiced by the loss or destruction of the evidence; and (3) whether the government was acting in good faith when it destroyed or lost the evidence. *Id*. at 1312-13.

   This test is consistent with clearly-established United States Supreme Court precedent governing this area of law. In *California v. Trombetta*, 467 U.S. 479 (1984), the Court determined that the Fourteenth Amendment does not demand that the State preserve potentially exculpatory evidence on behalf of defendants. There, the Court held that law enforcement agencies did not have to preserve breath-analysis samples of suspected drunk drivers in order for the results of the tests to be admissible in criminal proceedings. 467 U.S. at 491.

   In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Court determined that the government's *bad faith* destruction of, or failure to preserve, potentially useful or exculpatory evidence violates the Due Process Clause. The defendant bears the burden of showing "bad faith on the part of the police." *Id*. at 58.

   In considering the merits of Petitioner's two claims, the Idaho Court of Appeals determined:

> It is Carr's burden to provide admissible evidence supporting his allegations. Concerning the box of jewelry and other valuables, Carr contends that, because "the detective was provided the box and it was never seen from again. . . [there is] an inference that it was withheld from [Carr] in bad faith." That is the extent of Carr's

argument that the police conduct relating to the disappearance of the alleged box of valuables was in bad faith. However, this argument is without merit. The mere absence of a piece of evidence does not raise an inference of bad faith. If so, the requirement of bad faith would be superfluous. Carr has failed to support this allegation with any admissible evidence. Therefore, the district court did not err by summarily dismissing this claim.

(State's Lodging D-4, p. 7.)

> According to the affidavits attached to Carr's application, Carr's family members notified the detective of the alleged existence of exculpatory evidence inside the vehicle and the detective reported to them that he found no such evidence when he searched the vehicle. The family members then went to Jackpot, Nevada, to retrieve the vehicle and it could not be located. Later, Jackpot police notified the family that the vehicle had been taken to a towing and wrecking business in Idaho where it was crushed. Once again, Carr argues that the unexpected destruction of the vehicle raises an inference of bad faith on the part of the police investigating the crime. Other than this assertion, Carr offers no admissible evidence supporting his allegation that his vehicle was destroyed in bad faith. Therefore, the district court did not err by summarily dismissing this claim.

(*Id.*, p. 7.)

Petitioner is unable to point to a place in the state court record demonstrating that he presented evidence that the State acted in bad faith in either not documenting the jewelry in the evidence log (it was apparently returned to the jewelry store from where the jewelry was stolen) or in having something to do with destruction of the car. Because there is no evidence of bad faith, the Court must presume that the state court's findings of fact are correct.

Turning to the Idaho Court of Appeals's decision, this Court concludes that

**MEMORANDUM DECISION AND ORDER - 39**

its application of the *Paradis* factors in reaching the conclusion is not contrary to *Trombetta* and *Youngblood*. The *Trombetta* Court specifically held that destruction of evidence that is not done in bad faith is *not* a due process violation, and, in *Youngblood*, the Court emphasized that the burden of showing bad faith lies with the defendant (here, Petitioner). Petitioner's case is like *Trombetta*, where there was no showing of bad faith. The absence of bad faith, as the Idaho Court of Appeals concluded, is fatal to Petitioner's claim.

The Idaho Court of Appeals did not analyze the other two factors: materiality to guilt or prejudice caused by the loss of the evidence. The record reflects several different allegations of what the box may have contained, but Petitioner did not develop any evidence before or during post-conviction proceedings to show materiality or prejudice. There are no affidavits from the police officer, and no affidavits from the jewelry store owner about the contents of the box. Petitioner's parents' statements regarding the contents of the box vary greatly from Petitioner's statements and contain inadmissible hearsay. Similarly, as noted above, Petitioner has offered *no* plausible details of how he was able to obtain a taped confession of Caleb Casey, or, realistically, why he would not have gone straight to the police with it. There is no doubt Petitioner has filed thousands of pages of documents with the state and federal courts; unfortunately, he neglected to obtain and submit material, admissible evidence supporting these critical points. In fact, if he, himself, made the tape of Caleb Casey, it is unclear

**MEMORANDUM DECISION AND ORDER  - 40**

why he did not prepare his own affidavit stating exactly: (1) the details of the conversation on tape; (2) why Casey confessed; (3) when Casey confessed; (4) where Casey confessed; (5) which recorder Petitioner used; and (4) how Petitioner was able to hold a conversation with Casey and at the same time surreptitiously capture it on tape. Therefore, Petitioner's claim also fails to meet the "potentially exculpatory" requirement of *Youngblood* and *Trombetta* because of the lack of evidence supporting the existence and nature of the items.

Accordingly, Petitioner is not entitled to relief on Claims 2(b) or 3(b) because he has not shown that the Idaho Court of Appeals's decision is based on an unreasonable determination of the facts based on the evidence in the state court record, or that it is contrary to *Youngblood* or *Trombetta*.

The Idaho Court of Appeals alternatively determined that, because Petitioner pleaded guilty, his evidentiary claims arising before that date were waived. "A valid guilty plea waives all nonjurisdictional defects and defenses, whether constitutional or statutory, in prior proceedings. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973). (State's Lodging D-4, pp. 7-8.)

Respondent argues that Petitioner has not successfully challenged his guilty plea as being invalid. The Court agrees, as explained below. Accordingly, Petitioner's evidentiary claims were waived by his guilty plea in solemn court proceedings. The Idaho Court of Appeals' decision that the claims were waived is not based on an unreasonable determination of the facts based on the evidence in

**MEMORANDUM DECISION AND ORDER  - 41**

the state court record, nor is it an unreasonable application of *Tollett v. Henderson*. Hence, relief is foreclosed by this alternative ground, as well.

### 3.    Claims 4(b), 4(c), 5(a), 6, 7, 13, 15, 19

Petitioner also asserts a set of claims that Petitioner's guilty plea was rendered involuntary under the Due Process Clause as a result of the detective/jailors' actions to create a living environment so hostile that he would be forced to plead guilty. He alleges that they used delay as a tactic to coerce a confession (Claim 4(b)); that jailors incited other inmates to assault Petitioner by telling the inmates that Petitioner "ratted" on someone (Claim 4(c)); that his cell lights were left on 24 hours a day for 21 months (Claim 5(a)); that he was denied warm clothing in winter and during outdoor recreation times (Claim 6); that he was refused recreation opportunities, including outdoor recreation for weeks and months at a time (Claim 7)); that he was denied medical attention for different health conditions and injuries and placed in detention for 400 days over his insistence that he be permitted to call his attorney (Claim 13); that the Sheriff's Department retaliated against Petitioner by calling him names they knew would cause other inmates to attack him (Claim 15); and that Petitioner was denied food, showers, appropriate cell temperatures, toilet paper, religious services, toothpaste, and soap. (Claim 19 (due process theory only)).

To summarize, Petitioner "claims that he was starved, poisoned, denied medical treatment and clean clothing, intentionally left in the company of prisoners

**MEMORANDUM DECISION AND ORDER  - 42**

who assaulted him on numerous occasions, identified by jail guards to other prisoners as a rat and a rapist, held for extensive periods in lockdown with no recreational access, deprived of warm clothing and blankets and intentionally kept in a cold cell, subjected to bright lights and continuous noise, and forced to live in unsanitary conditions." (State's Lodging D-4, p. 4.)

In the state post-conviction matter, Petitioner alleged that all of these conditions were intended to coerce him to plead guilty. He alleged that he pleaded guilty for "the sole purpose of human survival." (State's Lodging D-4, p. 4.)

The Idaho Court of Appeals rejected Petitioner's claim, contrasting his affidavit complaining of his conditions of confinement with his change-of-plea colloquy:

> The Court:    Have you taken any alcohol or drugs or other medication in the last 48 hours?
>
> Petitioner:    No, sir, I have not.
>
> The Court:    Is there or are you suffering from any mental or psychological problems that make it hard for you to understand these proceedings?
>
> Petitioner:    No, sir.
>
> The Court:    Is there anything else going on in your life that affects your ability to make a reasoned and informed decision today?
>
> Petitioner:    No, sir.
>
> The Court:    Has anyone made any other promises or comments to you that haven't been discussed on the record here

|  | today? |
|---|---|
| Petitioner: | No, sir, they have not. |
| The Court: | Has anyone told you that [the district court] will follow this plea agreement? |
| Petitioner: | No, sir, they have not. |
| The Court: | Has anyone told you that he would go easier on you for pleading guilty rather than exercising the right to go to trial. |
| Petitioner: | No, sir, they have not. |
| The Court: | Has anyone threatened you or anyone close to you in order to get you to enter a plea of guilty here today? |
| Petitioner: | No, sir. |
| The Court: | Is your decision to plead guilty a voluntary decision? |
| Petitioner: | Yes, sir, it is. |

(State's Lodging A-3, pp. 6-7, 10.)

The Idaho Court of Appeals concluded that, "[b]ecause the allegations contained in Carr's Affidavit were clearly contradicted by his sworn testimony given at the change of plea hearing, we conclude that they do not create a genuine isse of material fact meriting an evidentiary hearing." (State's Lodging D-4, p 5.)

That Court further reasoned:

> [N]ot only were Carr's claims clearly contradicted by his prior sworn testimony, but there is a gaping evidentiary hole at the heart of Carr's contentions. Carr was incarcerated for sixteen months

**MEMORANDUM DECISION AND ORDER  - 44**

prior to the entry of his guilty plea. Other than fantastical claims provided in his affidavit, Carr provided no admissible evidence documenting the alleged deplorable conditions in the form of prisoner complaints, medical records, or attorney communications. If Carr had been near death on several occasions, as he claims, there would at least be documentation of his treatment in the infirmary. However, Carr provided no such evidence with his application.

(State's Lodging D-4, p. 6.) Accordingly, the Idaho Court of Appeals concluded that "the district court did not err by summarily dismissing Carr's claim that his guilty plea was involuntary due to conditions of his pretrial confinement." (*Id.*)

Petitioner argues that he submitted multiple affidavits of other inmates supporting his contentions to the Fifth Judicial District Court in Twin Falls County. However, it does not appear that he submitted these exhibits through his attorneys, or that his attorneys chose to submit these exhibits for him, as explained above.

The affidavits are not found in the state court record lodged by Respondent, but appear in Petitioner's "Notice of Lodging Exhibits, Pleadings, State Court Records, etc." (Dkt. 34.) The affidavits were submitted in support of Petitioner's state habeas corpus petition that was dismissed as moot after Petitioner was transferred (which is akin to a conditions of confinement lawsuit) and in his civil rights lawsuit filed in state court, but not in his post-conviction action. (Dkt. 34.) Each affidavit states that the inmate was subjected to a variety of poor conditions at the Twin Falls County Jail.

The Court previously determined that Petitioner's exhibits lodged at Docket

**MEMORANDUM DECISION AND ORDER  - 45**

No. 34 could be used to show cause and prejudice or a miscarriage of justice, but that they should not be used in an analysis of the merits of his claims. (Dkt. 42, p. 11.) As this case is now at the stage of proceedings where a merits analysis is performed, Petitioner will not be entitled to rely on these exhibits that were not submitted in the state court criminal proceedings.[6]

The United States Supreme Court has held that the validity of a guilty plea turns on "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A voluntary plea must be free from either "physical or psychological coercion." *Henderson v. Morgan*, 426 U.S. 637, 653 (1976).

There is no doubt from the record that Petitioner felt as though his living conditions were very difficult circumstances to bear. However, nothing in the state court record (and nothing in other inmates' affidavits that are not in the record)

---

[6] Even if the Court were to consider the affidavits of the other inmates, the affidavits would show only that inmates suffered from a large variety of what they perceived to be unconstitutional living conditions. The inmates do not assert that the purpose of the poor living conditions was to coerce each of them to plead guilty, and they do not assert that the living conditions were so poor that their will was overcome and they felt compelled by the conditions alone to plead guilty. Further, this theory of why Petitioner pleaded guilty stands in contrast to the other reasons he proffers for pleading guilty: a governmental conspiracy between detectives and Caleb Casey to provide cover for Casey, fear that Caleb Casey would hurt him or his family, avoidance of a fixed life sentence, or that he was taking responsibility for having killed S.B.

In addition, Petitioner, in fact, brought his claims to federal court in a civil rights lawsuit, and was unable to make it past summary judgment with his claims of unconstitutional living conditions. *Carr v. Tousley*, Case No. 1:06-cv-00125-JLQ.

MEMORANDUM DECISION AND ORDER  - 46

demonstrates that the conditions acted *as a force* to (1) overcome the will of Petitioner or any other inmate who did not really wish to plead guilty and (2) actually cause Petitioner or any other inmate to plead guilty.

Importantly, based upon the record submitted to the state court, Petitioner's claims that jailors and detectives forced him to plead guilty is clearly contradicted by his prior sworn testimony, by his failure to tell the evaluating psychologist of the forces that overcame his will, and by his taking responsibility for S.B.'s death at the sentencing hearing, instead of professing his innocence and revealing the coercive nature of his conditions of confinement. This factual finding of the Idaho Court of Appeals is clearly supported by Petitioner's own words in many places throughout the entire state court record.

Accordingly, the Idaho Court of Appeals's decision is not based on an unreasonable determination of the facts, nor is it contrary to, or an unreasonable application of *North Carolina v. Alford* or of *Henderson v. Morgan*. Hence, habeas corpus relief is not warranted.

**4.      Claims 10 and 24(f)**

Claim 10 is that Petitioner's counsel performed ineffectively when he did nothing in response to Petitioner's complaints that his right to have attorney-client privileged conversations with his counsel was impaired by the fact that the jail visitation rooms were not sound-proof. Petitioner alleges he could not develop evidence to demonstrate that he did not commit the crime. (Dkt. 3-1, p. 43.) Claim

**MEMORANDUM DECISION AND ORDER  - 47**

24 is that Petitioner's counsel was ineffective for allowing the Sheriff's Department to monitor and record attorney-client visits.

The Idaho Court of Appeals determined that "Carr's claims that the jail interfered with his right to the effective assistance of counsel by monitoring legal communications and limiting access to legal materials and that counsel was ineffective for allegedly failing to do anything about it also are not supported by admissible evidence." (State's Lodging D-4, p. 12.) In particular, Petitioner provided no evidence documenting the substance of the conversations that allegedly were monitored. (*Id*., p. 11.)

A criminal defendant has a constitutional right to the assistance of counsel under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335 (1963). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the proper test to be applied to claims alleging constitutionally inadequate representation. To succeed on such a claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and that (2) the petitioner was prejudiced thereby. *Id*. at 684. Prejudice under these circumstances means that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

**MEMORANDUM DECISION AND ORDER  - 48**

In assessing whether trial counsel's representation fell below an objective standard of competence under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*. The pertinent inquiry "is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

A petitioner must establish both incompetence and prejudice to prove an ineffective assistance of counsel case. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

Like the state court pleadings, the Petition for Writ of Habeas Corpus offers no enlightenment about how Petitioner "was unable to develop evidence to demonstrate that he did not commit the crime because he could not gain confidential communications with his attorneys, i.e., prejudice." (Petition, Dkt. 8-1, p. 6.) Neither has Petitioner ever revealed the content of the conversations that were monitored, or how that damaged his defense. Accordingly, the decision of the Idaho Court of Appeals rejecting this claim for lack of any supporting admissible evidence is not based on an unreasonable determination of the facts, nor is it

**MEMORANDUM DECISION AND ORDER  - 49**

contrary to *Strickland*, because, even if Petitioner's counsel was deficient in his performance for failing to demand a place to have confidential communications, Petitioner has pointed to no particular evidence he was unable to develop. Hence, no prejudice occurred, causing the ineffective assistance claim to fail.

**8.     Claim 24(c)**

Petitioner alleges that his counsel was ineffective for failing to file a motion to change venue. In support, Petitioner alleged that there was a "widespread conspiracy and connection among everyone in the locality where he was charged which denied him the opportunity of a fair trial." ((State's Lodging D-4, p. 9.)

The Idaho Court of Appeals determined that Petitioner failed to bring forward any admissible evidence to support a claim that his attorney should have filed a change of venue motion. (State's Lodging D-4, p. 12.) In particular, the Court explained:

> A criminal defendant may seek a change of venue by statute or by rule of criminal procedure if he or she believes a fair and impartial trial cannot be had in the county where the indictment is pending. The trial court can transfer the case to another county if satisfied that a fair and impartial trial cannot be had. This decision rests with the sound discretion of the court. In this case, Carr provided no evidence to support his claim that the entire locality where he was being tried was connected in a conspiracy against him. We conclude that a motion for a change of venue would have had very little, if any, chance of success.

(State's Lodging D-4, p. 9 (internal citations omitted).)

In *Murphy v. Florida*, 421 U.S. 794, 798 (1975), the court held that a

change of venue is required only where the defendant shows that the pretrial

publicity has been so extreme as to cause actual prejudice or that the media

coverage had "utterly corrupted" the trial. In *Dobbert v. Florida*, 432 U.S. 282,

303, 97 S.Ct. 2290, 2303 (1977), a case in which a father was charged with

murdering two of his children and torturing and abusing his two remaining

children, the Court explained application the *Murphy* standard:

> Under *Murphy*, extensive knowledge in the community of either the
> crimes or the putative criminal is not sufficient by itself to render a
> trial constitutionally unfair. Petitioner in this case has simply shown
> that the community was made well aware of the charges against him
> and asks us on that basis to presume unfairness of constitutional
> magnitude at his trial. This we will not do in the absence of a "trial
> atmosphere . . . utterly corrupted by press coverage," *Murphy v.
> Florida, supra*, 421 U.S., at 798, 95 S.Ct., at 2035.

Here, Petitioner brought forward no evidence that an impartial jury could

not have been seated had he proceeded to trial. Neither did he show that there was

a widespread conspiracy in the community that either endangered his life or caused

his criminal proceeding to be unfair in any other way. While Petitioner has woven

together his own inferences from his circumstances, implicating judges,

prosecutors, defense attorneys, court clerks, detectives, jailors, and his best friend

in a conspiracy against him, he has provided little evidence that would corroborate

such a theory. His conspiracy allegations would be slightly more plausible if he

had not confessed to the murder in so many different settings at so many different

times. Petitioner cannot create a case of conspiracy based on speculation and self-

**MEMORANDUM DECISION AND ORDER  - 51**

contradictory stories to support a change of venue claim.

Because there is insufficient evidence in the record to show that grounds for a change of venue existed, and that such a motion would have been successful, Petitioner has not shown that his attorney's performance was deficient, or that Petitioner suffered prejudice. The Idaho Court of Appeals's decision was not based on an unreasonable determination of the facts, nor was the decision an unreasonable application of *Strickland*. Hence, habeas corpus relief is not warranted on Claim 24(c).

**5.      Claim 28(a)**

Claim 28(a) alleges that Petitioner was prejudiced by counsel's failure to investigate the crime scene. The Idaho Court of Appeals determined that Petitioner's claims of failure to investigate were disproved by the colloquy at the change of plea hearing:

| | |
|---|---|
| Court: | Have you had adequate access to your lawyer to discuss the law and the fact of this case? |
| Petitioner: | Completely. |
| Court: | Is there anything you've wanted your attorney to do or ask him to do to help you with your case that he hasn't done? |
| Petitioner: | No, sir, not at all. |
| Court: | Have you gone over discovery with your attorney? |
| Petitioner: | Yes, sir. |

**MEMORANDUM DECISION AND ORDER  - 52**

Court:        Did you understand what was discussed?

Petitioner:   Yes, sir.

Court:        Did you request any additional discovery be
              done in your case?

Petitioner:   No, sir, I do not.

(State's Lodging D-4, p. 10.)

Counsel requested from the court, and received, funds for a forensic pathologist and a forensic scientist to re-examine the cause of death of the victim, and for a psychologist to examine and evaluate Petitioner regarding his state of mind and intent at the time of the alleged crime, specifically, for the possibility that Petitioner could have been suffering from Attention Deficit Disorder and/or other personality disorders that could affect the element of intent. (State's Lodging A-1, pp. 43-75.) These requests show that counsel was pursuing a strategy and defense.

Petitioner alleges that counsel should have pursued all of the "facts" underlying the conspiracy theory of innocence–the jewelry box, the taped confession, the finger print evidence, the robbery connection, and the drugs. Petitioner asserts that his counsel merely concluded that Petitioner was lying, and that was the reason counsel failed to do further investigations. However, Petitioner has been unable to come up with solid evidence showing that any part of his conspiracy theory would have been a successful defense.

**MEMORANDUM DECISION AND ORDER  - 53**

As a result, Petitioner has shown neither deficient performance nor prejudice to his case by his counsel's failure to conduct further investigations of the crime scene. Petitioner cannot overcome his solemn declarations in state court that he was fully satisfied with his counsel's performance by relying on mere speculation. Based on the record before the state courts, this Court concludes that the state court determination was not based on an unreasonable finding of fact, nor was the determination contrary to *Strickland*. Therefore, this claim does not warrant habeas corpus relief.

**6.     Conclusion**

None of Plaintiff's remaining claims merits habeas corpus relief, either under 28 U.S.C. § 2254(d)(1) or (d)(2). Plaintiff is not entitled to summary judgment because he has failed to take into consideration the restrictions of AEDPA. Accordingly, his Petition will be denied and dismissed with prejudice.

**REVIEW OF THE CLAIMS AND THE COURT'S DECISION
FOR PURPOSES OF CERTIFICATE OF APPEALABILITY**

In the event Petitioner files a notice of appeal from the Order and Judgment in this case, the Court now evaluates the claims within the Petition for suitability for issuance of a certificate of appealability (COA), which is required before a habeas corpus appeal can proceed. 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); Rule 11(a), Rules Governing Section 2254 Cases.

**MEMORANDUM DECISION AND ORDER  - 54**

A COA will issue only when a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, under this standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.*" Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal citation and punctuation omitted).

When a court has dismissed a petition or claim on procedural grounds, in addition to showing that the petition "states a valid claim of the denial of a constitutional right," as explained above, the petitioner must also show that reasonable jurists would find debatable whether the court was correct in its procedural ruling. *Slack,* 529 U.S. at 484. When a court has dismissed the petition or claim on the merits, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484. The COA standard "requires an overview of the claims in the habeas petition and a general assessment of their merits," but a court need not determine that the petitioner would prevail on appeal. *Miller-El*, 537 U.S. at 336.

Here, the Court has dismissed Petitioner's claims on procedural grounds, and some have been alternatively denied on the merits. The Court finds that additional briefing on the COA is not necessary. Having reviewed the record again, the Court concludes that reasonable jurists would not find debatable the

**MEMORANDUM DECISION AND ORDER  - 55**

Court's decision on the procedural issues and the merits of the claims raised in the Petition and that the issues presented are not adequate to deserve encouragement to proceed further. As a result, the Court declines to grant a COA on any issue or claim in this action.

If he wishes to proceed to the United States Court of Appeals for the Ninth Circuit, Petitioner must file a notice of appeal in this Court **within thirty (30) days after entry of this Order**, and he may file a motion for COA in the Ninth Circuit Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b)(2).

**ORDER**

**IT IS ORDERED:**

1.   Petitioner's Motion for Reconsideration of Appointment of Counsel (Dkt. 47) is DENIED.

2.   Petitioner's Motion to Show Cause and Plea to Excuse State Remedy, Exhaustion Requirement (Dkt. 45) is DENIED.

3.   Petitioner's Motion for Evidentiary Hearing (Dkt. 48) is DENIED.

4.   Petitioner's Motion to Expand the Record (Dkt. 49) is DENIED.

5.   Respondent's Motion for Extension of Time to File Answer or Motion for Summary Judgment (Dkt. 55) is GRANTED.

6.   Respondent's Motion to Strike Petitioner's Exhibits (Dkt. 61) is GRANTED.

**MEMORANDUM DECISION AND ORDER  - 56**

7.     Respondent's Motion for Extension of Time to File Response (Dkt. 62) is

      GRANTED.

8.     Petitioner's Motion Objecting to Respondent's Second Motion for

      Extension of Time (Dkt. 63) is DENIED.

9.     Petitioner's Motion for Summary Judgment (Dkt. 46) is DENIED.

10.    The Petition for Writ of Habeas Corpus (Dkt. 3) is DENIED and

      DISMISSED with prejudice.

11.    The Court will not grant a Certificate of Appealability in this case. If

      Petitioner chooses to file a notice of appeal, the Clerk of Court is ordered to

      forward a copy of this Order, the record in this case, and Petitioner's notice

      of appeal, to the United States Court of Appeals for the Ninth Circuit.

DATED:  **March 28, 2013**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM DECISION AND ORDER  - 57**